**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

PAUL T. GRANT,

    Plaintiff,

    v.                                        Case No. 07-C-0800

JEFFERSON WELLS INTERNATIONAL, INC.,

    Defendant.

## **DECISION AND ORDER**

Plaintiff Paul T. Grant filed this action on September 5, 2007, alleging that the defendant, Jefferson Wells International, Inc.(JWI), discriminated against him based on his race when it terminated his employment on January 23, 2006, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Title VII). The plaintiff also alleges a claim pursuant to 42 U.S.C. § 1983.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

The defendant filed a motion for summary judgment on July 31, 2008. (Docket #21). The motion is fully briefed and will be addressed herein.

## **STANDARD FOR SUMMARY JUDGMENT**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., Ltd., 475 U.S. 574, 587 (1986).

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324. In deciding a motion for summary judgment, all inferences are taken in the light most favorable to the nonmoving party. Matter of Wade, 969 F.2d 241, 245 (7th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 [1986]). Defeating summary judgment requires more than just a "swearing match"; rather, the nonmoving party must present some evidence that a genuine issue of material fact exists. Wade, 969 F.2d at 245.

The evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT & T Communications, Inc., 972 F. 2d 845, 849 [7th Cir. 1992]. Federal Rules of Civil Procedure 56(e) expressly provides in pertinent part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

(Emphasis added). See also, Halloway v. Milwaukee County, et al, 180 F.3d 820, 827 n.9 (7th Cir. 1999). A finding of fact based on an affidavit which contains conclusory legal statements and is barren of any relevant facts of which the affiant had personal knowledge is not proper under Rule 56(e). See Resolution Trust Corporation v. Juergens, 965 F.2d 149, 152-53 (7th Cir. 1992). Moreover, a party may not create an issue of fact with an affidavit containing conclusions that contradict depositions or other sworn testimony. F.T.C. v. Bay Area Business Council, Inc., 423 F.3d 627 (7th Cir. 2005). Affidavits based on "information and belief" – facts that the affiant believes are true, but which the affiant does not know are true – are not proper on summary judgment. Toro Co. v. Krouse, Kern & Co., 827 F.2d 155, 162-63 (7th Cir. 1987).

Civil Local Rule 56.2 (E.D. Wis.) also sets forth additional requirements for motions for summary judgment. The court of appeals for this circuit has "repeatedly upheld the strict enforcement of the requirements of district court local rules." See Waldridge, 24 F.3d at 921. Specifically, Civil L. R. 56.2(b)(1) provides that any response to a motion for summary judgment "must include:"

> A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number

and must include specific citations to evidentiary materials in the record which
support the claim that a dispute exists.

Likewise, Civil L.R. 56.2(b)(2) further provides that the movant responding to the opposing party's findings of fact must do so "in accordance with the provisions of subparagraph (b)(1) of this rule." In responding to a proposed finding of fact, a party must include a specific citation to evidentiary materials in the record. Merely citing to another proposed finding of fact which contains a citation to such evidentiary materials does not comport with the requirements of the local rule and requires the court to plow through the proposed findings in an attempt to obtain the evidentiary citation. The court is not obligated to scour the record to determine whether a material issue of fact exists. See, e.g., Uhl v. Zalk Josephs Fabricators, Inc., 121 F.3d 1133, 1135 (7th Cir. 1997); Waldridge, 24 F.3d at 922. To the extent a party has not provided evidentiary support for its opposition to a particular proposed finding of fact, such party has not raised an arguable factual dispute.

## **RELEVANT UNDISPUTED FACTS**[1]

Plaintiff Paul T. Grant, an African American, is an adult resident of Wisconsin. On July 12, 2002, the plaintiff was hired by Jefferson Wells International, Inc. (JWI) as a Help Desk Analyst. The plaintiff was terminated by JWI on January 23, 2006.

JWI is an independently operating, wholly owned subsidiary of Manpower, Inc. with corporate headquarters located in Milwaukee, Wisconsin. JWI, with its more than 45 offices across North America and Europe, is a global provider of professional services in the areas

---

[1] As a general matter, unless accompanied by citation, the relevant facts are taken from the parties' proposed findings of fact which are not disputed. Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

of risk, controls, compliance and financial process improvement. The company specializes in internal audit, technology risk management, tax and accounting and finance. JWI's Information Technology (IT) operations are centralized at the company's headquarters in Milwaukee. The IT department consists of the following sub-groups: 1) the corporate applications group, which manages the software portfolio; and 2) the corporate technologies group, which includes the Help Desk, IT operations, networking and telecommunications. During the relevant period, the managers of both groups reported directly to Michael O'Brien, Director of Information Technology.

From April 2004 until April 2005, Al Schumann served as Manager of Corporate Technology, overseeing the Help Desk, desktop arena and server functions. In April 2005, Victor Nightingale took over as Manager of Corporate Technology, reporting to Mr. O'Brien. Mr. Nightingale held this position until January 3, 2006, when he transferred to another position with Manpower, Inc. In 2005 and 2006, Jim Koll served as Manager of Corporation Applications.

When the plaintiff was hired as a Help Desk Analyst, his duties included answering calls from end users and troubleshooting. In June 2004, JWI promoted the plaintiff to the position of Help Desk Team Lead. He interviewed for the position with his manager, Al Schumann. The ultimate decision to promote the plaintiff to Help Desk Team Lead was made by Mr. O'Brien.

As the Team Lead, the plaintiff took on the responsibility for training and managing other members of the Help Desk team. He was also responsible for personnel management on the Help Desk. The Team Lead had responsibility for scheduling, monitoring the progress of calls and addressing problem areas, such as long waits in the Help Desk queue and the rate

of abandoned calls (where the caller hangs up before receiving service). The Team Lead was also a working leader, in that JWI expected the plaintiff to continue to respond to calls from end users, including "escalated" calls that presented issues that were not resolved immediately by the first responder to the call.

In early March 2005, the plaintiff received his annual performance review, which was an evaluation of his performance in 2004. Mr. O'Brien reviewed and approved Mr. Schumann's assessment of the plaintiff's performance at that time.

In his 2004 performance review, the plaintiff received an overall rating of four (4), "needs improvement" on a scale of one (1) to five (5), with 1 representing "outstanding" and 5 represented "unsatisfactory." The plaintiff received a rating of three (3), "meets expectations," in two of the areas: Functional Skills/Technological Knowledge and Team Work/Team Player.

In early 2005, Mr. O'Brien decided to reorganize the management structure of the IT department to consolidate certain management functions in order to provide superior service to end users. The position of End User Services (EUS) Team Lead, which was created in 2005, oversaw three areas: the Help Desk, telecommunications and networking. The End User Services Team Lead became the first line supervisor of the Help Desk employees, reporting to the Technology Manager. The EUS Team Lead absorbed all of the supervisory responsibilities of the Help Desk Team Lead position. Brad Neuenschwander, who had previously worked as a telecommunications analyst, was promoted to EUS Team lead on March 13, 2005.

The plaintiff's position as Help Desk Team Lead was, in large part, absorbed into the EUS Team Lead position. In March 2005, the Help Desk Team Lead position was eliminated

- 6 -

and the plaintiff was reclassified as Senior Help Desk Analyst.  The plaintiff continued to receive the same pay and benefits, which had been increased when he was placed in the Team Lead role.

When Mr. Nightingale replaced Mr. Schumann as Manager of Corporate Technology, in April 2005, he became the plaintiff's manager.  At that time, Mr. Neuenschwander was the plaintiff's supervisor.  In September 2005, Mr. Neuenschwander was promoted to Technical Services Team Lead, reporting to Mr. Nightingale.  In September 2005, Troy Jilot was promoted from Network Analyst to EUS Team Lead, overseeing the Help Desk and the PC lab.  Mr. Jilot became the plaintiff's direct supervisor in September 2005.

On September 16, 2005, the plaintiff's mid-year performance review was prepared, covering the period from January to September 2005.  In the mid-year review, Mr. Nightingale addressed his perceptions of the plaintiff's work:

> As a Senior Help Desk Analyst for Jefferson Wells, Paul is at an acceptable level of Customer Service and handles calls with the appropriate level of professionalism.  He is a good mentor as it applies to training new personnel.  However, I do not see the leadership of a Senior level person.  He does not engage with new thoughts or ideas for improving the call abandoning rate and seems disengaged and satisfied with his current level of contribution.  He will need to contribute much more to address the problems that are currently plaguing the Help Desk.  I expect Paul to add value at ever [sic] step in the development of a plan to better service the customer.

(Declaration of Victor Nightingale [Nightingale Decl.] ¶ 5, Exh. A at 2).  Mr. Nightingale did not consider the plaintiff's race when completing the plaintiff's performance review.

The September 2005 Review also states that "Paul continues to take a leadership role within the Help Desk team by training and mentoring Help Desk Analysts.  He is the 'go to' person for complex end user problems."  (Nightingale Decl., Exh. A at 1).  The September 2005 Review further states that "Paul displayed outstanding professionalism during his

- 7 -

transition to the Senior Help Desk Role." Id.  The plaintiff disagreed with the performance review and met with Mr. Nightingale to discuss it.

In the fall of 2005, the abandoned call rate, an indicator of the functioning of the Help Desk, was unacceptably high.  On December 7, 2005, the plaintiff was contacted by Mr. Jilot because there were 52 unanswered voice mails in the queue, and some messages from the previous morning had been sitting in the voice mail overnight.  Management also received complaints from end users concerning the plaintiff's attitude and lack of helpfulness.  Richard S. Keen, Manager of Human Resources, in Tampa, Florida, complained several times about the plaintiff's attitude and unwillingness to help in response to his requests.  In mid-November, Mr. Keen notified management of his dissatisfaction with the plaintiff.  Another JWI employee, Lisa Janzen, sent an email to Mr. Jilot as a formal complaint about the plaintiff's unacceptable attitude and level of service.

Each year at the end of the calendar year, the IT department was budgeted a pool of funds to be used for merit-based pay increases for employees.  Mr. O'Brien decided the percentage increase each employee would receive.  In order to determine the amount of merit pay increase for each individual employee, Mr. O'Brien developed a ranking process whereby each employee was ranked relative to the others in the IT department.  Mr. O'Brien completed the ranking process at the end of each calendar year with his two managers, the Manager of Corporate Technology and the Manager of Corporate Applications.

As the first step in the ranking process each manager would rank, in descending order, the employees within that manager's group (i.e., technology or applications).  The managers would meet with Mr. O'Brien and together the team would merge the technology and applications rankings together based on a comparative assessment of individual employee

- 8 -

performance. The integration process would yield one comprehensive, performance-based ranking of all IT employees. Mr. O'Brien never considered race as a factor in his decision to rank employees based upon performance. In 2004, Mr. O'Brien ranked the plaintiff 18 of the 22 employees in the IT department.

In 2005, Mr. Nightingale ranked the plaintiff 10 of 11 employees in the technology sub-group. The employee who was ranked 11 of 11 quit on January 3, 2006. Race was not a factor in ranking the plaintiff and the other employees.

In December 2005, Mr. Nightingale, Mr. Koll and Mr. O'Brien met to discuss the comprehensive department rankings for the 2006 merit-based pay increase. The plaintiff was ranked 26 of 27 department employees for the merit-based pay increase, but after the lowest ranking employee quit, the plaintiff was ranked 26 of 26 IT department employees. The other Help Desk Analysts in January 2006 were: Cleveland Weller (ranked 12 of 26); Rodney Buford (ranked 15 of 26); and Phil Ortman (ranked 24 of 26).

Mr. Jilot was not a Help Desk Analyst, but rather was the EUS Team Lead. His duties were not the same as the plaintiff's. Mr. Jilot was a member of management in January 2006, and the plaintiff reported directly to Mr. Jilot, who reported to Mr. Nightingale. Mr. Jilot was mainly responsible for management, not answering calls from end users. The plaintiff's primary function as Senior Help Desk Analyst was responding to requests from end users. He spent approximately 75% of his time responding to user requests and 25% of his time training other help desk employees.

During late December 2005 and early 2006, JWI identified a substantial shortfall in revenue as compared to expectations and budget. Staffing levels in 2005, including IT department staff, had been established based upon the Company's budget and anticipated

revenue. Because revenue forecasts were below expectations in late December 2005 and early January 2006, JWI determined in mid-January 2006, that a cost cutting initiative was needed. JWI's Chief Executive Officer George Hermann, the Vice President and Chief Financial Officer, and the President collectively decided that reductions in staffing levels was needed and they determined that staff in the corporate office would be reduced by nine positions. Mr. O'Brien reported directly to Mr. Hermann.

Staffing cuts were made in all departments, with the number of positions cut generally proportional to the overall size of the department. Three positions were eliminated from the IT department with additional cuts made in the Accounting, Human Resources, Marketing and Product Management departments.

In late January, Mr. Herrmann informed Mr. O'Brien that the decision had been made to reduce staffing levels and that he had to cut three positions from the IT department. Mr. Herrmann did not tell Mr. O'Brien how to decide which positions to eliminate, but his general expectation was that Mr. O'Brien would make the reductions based upon performance and overall contribution to the critical operations of the IT department. Mr. O'Brien, who was solely responsible for deciding which three positions to eliminate from the IT Department, was given less than one week to identify the positions to eliminate. In deciding the positions to eliminate, Mr. O'Brien considered only the performance of each employee, not the employee's length of service, wage level or race.

To determine the demonstrated performance of the IT employees, Mr. O'Brien referred to the rankings that had been done for the 2006 merit pay increase, where the plaintiff ranked the lowest as of January 2006. The plaintiff was also the lowest ranked remaining employee in the technology sub-group, as ranked by Mr. Nightingale. Mr. O'Brien determined that the

- 10 -

plaintiff's position should be eliminated as part of the cost reduction initiative solely because of the plaintiff's performance. Mr. O'Brien also eliminated two other positions from the IT department in January 2006 based upon performance. The other individuals whose jobs were eliminated were Anthony Mueller (applications) and Shawn Thompson (technology), both of whom are white males. Mr. O'Brien decided to retain other African American employees in the IT department, including Rodney Buford and MaRico Holland. Mr. Jilot was not terminated as part of the cost savings initiative. At the time of his termination, the plaintiff had more seniority than the other members of the Help Desk

On January 23, 2006, the plaintiff received a telephone call at his home informing him that he was being terminated from his position. The plaintiff was originally scheduled to work that day, but he was out sick. Mr. O'Brien informed the plaintiff that because of company-wide cost-cutting, his position was being eliminated. On the same date, the company's Human Resources Department sent a letter to the plaintiff informing him that he was being terminated as part of a firm-wide cost reduction initiative. The plaintiff does not know if a replacement was hired or what happened to his job duties when his employment ended.

On November 6, 2006, the plaintiff filed a charge of discrimination with the Wisconsin Department of Workforce Development, Equal Rights Division (ERD), stating that his employment was terminated based on his race. The plaintiff did not mention his March 2005 reclassification from Help Desk Team Lead to Senior Help Desk Analyst in his charge to the ERD. The plaintiff never told anyone within the company that he thought he was being treated unfairly because of his race.

- 11 -

Case 2:07-cv-00800-PJG   Filed 01/12/09   Page 11 of 16   Document 42

## ANALYSIS

At the outset, the court notes that the plaintiff has alleged a claim under 42 U.S.C. § 1983. To prevail on a claim for violation of § 1983, the plaintiff must establish that: 1) he held a constitutionally protected right, 2) he was deprived of this right in violation of the constitution, 3) the defendant intentionally caused this deprivation, and 4) the defendant acted under color of [state] law. See McNabola v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir. 1993) (citing Patrick v. Jasper County, 901 F.2d 561, 565 [7th Cir. 1990]).

Here, the plaintiff has presented no evidence that the termination of his employment involved any state action. Therefore, the plaintiff has not established a key element of a § 1983 claim. Accordingly, the portion of the defendant's motion seeking summary judgment on the plaintiff's § 1983 claim will be granted.

Regarding the plaintiff's race discrimination claim, Title VII makes it unlawful for an employer to ". . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color . . .." 42 U.S.C. § 2000e-2(a)(1). A plaintiff in a discrimination case may produce either direct evidence or indirect evidence of discrimination. The indirect method requires that the plaintiff apply the burden-shifting method outlined by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dept. Community Affairs v. Burdine, 450 U.S. 248 (1981); see also, Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994). In this case, the plaintiff states that he is proceeding under the indirect method. See Brief in Opposition to Defendant's Motion for Summary Judgment at 2.

Under the indirect method of proof, the burden is on the plaintiff to establish a prima facie case of discrimination. To establish a prima facie case of discrimination, the plaintiff must show: 1) that the plaintiff belongs to a protected group; 2) that the plaintiff performed the job satisfactorily; 3) that the plaintiff suffered an adverse employment action; and 4) that the employer treated similarly situated employees outside the protected group more favorably. Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc., 210 F.3d 750, 752 (7th Cir. 2000). If the plaintiff establishes all the elements of the prima facie case, the plaintiff raises an inference of discrimination. See South v. Ill. Envtl. Prot. Agency, 495 F.3d 747, 751 (7th Cir. 2007),

The similarly situated requirement typically requires evidence of a comparable employee who dealt with the same supervisor, was subject to the same standards, and engaged in similar conduct without additional circumstances that would differentiate the two. See, e.g., Humphries v. CBOCS West, Inc. 474 F.3d 387, 404-05 (7th Cir. 2007), aff'd. CBOS West, Inc. v. Humphries, 128 S.Ct. 1951 (2008); Burks v. Wis. Dep't of Transp., 464 F.3d 744, 751 (7th Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment decision. Maarouf, 210 F.3d at 752. Finally, if the defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason was pretextual. See Kirk, 22 F.3d at 138. The plaintiff may prove pretext directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for the adverse employment action] is unworthy of credence." Billups v. Methodist Hosp. of Chicago, 922 F.2d

- 13 -

1300, 1303 (7th Cir. 1991) (Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 [1981]). With respect to the issue of pretext, the court does not "sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination." Giannopoulos v. Brach & Brock Confections, Inc., 109 F. 3d 406, 410 (7th Cir. 1997).

In this case, the plaintiff has established that he belongs to a protected group and that he suffered an adverse employment action when he was terminated. However, the evidence does not establish that the plaintiff was performing his job satisfactorily. Rather, the undisputed facts show that at the time of his termination, the plaintiff was not meeting the defendant's legitimate performance standards.

The plaintiff received favorable comments in his mid-year performance review in September 2005. However, later in 2005, the abandoned call rate at the Help Desk was unacceptably high and management received complaints concerning the plaintiff's attitude and lack of helpfulness. Mr. Nightingale ranked the plaintiff 10 of 11 employees in the technology subgroup in 2005. The employee who was ranked 11 quit the company in early January 2006.

In December 2005, Mr. O'Brien established a ranking process to determine the amount of merit pay increase for each individual employee. With respect to the IT department, each employee was ranked relative to others in the department. Mr. O'Brien, Mr. Koll and Mr. O'Brien discussed the comprehensive department rankings for the 2006 merit-based pay increase. The plaintiff was ranked 26 of 27 department employees. When the lowest ranked employee quit her job on January 3, 2006, the plaintiff ranked last in performance in the department. Thus, the undisputed facts establish that the plaintiff was not performing his job satisfactorily.

- 14 -

Case 2:07-cv-00800-PJG   Filed 01/12/09   Page 14 of 16   Document 42

Moreover, the plaintiff also has not shown that there were other similarly situated employees outside the protected group who were treated more favorably. The plaintiff compares himself to Mr. Jilot, a white male. The undisputed facts show that Mr. Jilot was not a Help Desk Analyst like the plaintiff, but was the EUS Team Lead, a management position. His responsibilities were not the same as the plaintiff's duties. He was mainly responsible for management, not answering calls from end users. Another Help Desk member who was not terminated was Mr. Coleman, who is also a white male. According to the undisputed facts, Mr. Coleman was performing well at JWI and was meeting management's expectations. Rodney Buford, a black male and a Help Desk member was not terminated.

The plaintiff also asserts that he was the most senior Help Desk employee and that he had been involved in training other Help Desk members. He maintains that any cost reduction initiative should have led to the termination of the highest paid member of the Help Desk or those with less seniority. However, the evidence shows that Mr. O'Brien considered an employee's performance, not his or her seniority status or wage rate in determining which employees would be terminated. It is not the court's role to function as a personnel department and weigh the wisdom or lack thereof of a company's employment decisions. See Giannopoulos, 109 F. 3d at 410. Thus, based on the undisputed facts before the court, the plaintiff has failed to establish a prima facie case of discrimination based on his race.

Even if the court were to conclude that the plaintiff had established a prima facie case of racial discrimination, the defendant has presented a legitimate, nondiscriminatory reason for its employment decision to terminate the plaintiff – a cost reduction initiative due to declining and below expectation revenue forecasts in late December 2005, and early January 2006. A plaintiff may prove that the employer's stated reason is pretextual. However, the

- 15 -

plaintiff has presented no evidence or argument to show that a discriminatory reason more likely motivated the defendant or that the defendant's proffered reason for his termination should not be given credence. See Billups, 922 F.2d at 1303. Instead, the plaintiff merely opines that the JWI's decision to terminate certain employees should have been made based on other criteria, namely seniority and wages paid.

In sum, the plaintiff has failed to present evidence to establish a prima facie of racial discrimination. He also has failed to show the requisite state action to proceed on a claim under 42 U.S.C. sec. 1983. Accordingly, the defendant's motion for summary judgment on the plaintiff's claims will be granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **granted.** (Docket # 22).

**IT IS FURTHER ORDERED** that this action be and hereby is **dismissed**.

**IT IS ALSO ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of January, 2009.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge
